## ST. LOUIS AND THE KANSAS CITY

# COURTS OF APPEALS

AT THE

MARCH TERM, 1905.

---

*(Continued from Volume 111.)*

---

LAVIN, Respondent, v. THE GRAND LODGE OF THE ANCIENT ORDER OF UNITED WORK-MEN OF MISSOURI, Appellant.

St. Louis Court of Appeals, April 4, 1905.

1. **MUTUAL BENEFIT ASSOCIATIONS: Suspension for Non-Payment of Dues: Tender of Dues.** The facts in this case are fully set out in the opinion given on the former appeal, reported in volume 104 Mo. App. 1.

2. ——: ——: ——. A member of a mutual benefit association who has been wrongfully suspended and whose tender of assessment has been refused, is not thereby excused from further obligation to perform, or offer to perform, his duties as member.

3. ——: ——: ——. Where a mutual benefit association refused to accept the payment by a member of one month's assessment when twice tendered, advancing as a reason that the amount tendered was insufficient, and wrongfully suspended the member for non-payment, and the member made no protest

against his suspension nor took any steps to procure a reinstatement in the order, though the order had ample provisions for such procedure, and made no further tender of assessments for ten months, until his death, he was properly treated as having abandoned his membership and his beneficiary could not recover in an action against the order upon the benefit certificate.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale,* Judge.

REVERSED.

*F. H. Bacon* for appellant.

(1)    Being suspended, Lavin could only be reinstated by compliance with the laws relative to reinstatement, which it is admitted he never did.    Carlson v. Supreme Council, etc.,115 Cal. 466, 47 Pac. Rep. 375; Grand Lodge v. King, 10 Ind. App. 639, 38 N. E. 352; Graves v. Modern Woodmen of America (Minn.), 89 N. W. R. 6; Rice v. Grand Lodge, etc., 92 Iowa 417, 60 N. W. R. 726; Sovereign Camp Woodmen of the World v. Rothschild (Tex.), 40 S. W. R. 553; McDonald v. Supreme Court, etc., 78 Cal. 49; Wells v. Independent Order, etc., 25 Canadian L. Journal (N. S.), 209; Lyon v. Sup. Assembly, etc., 153 Mass. 83; Harvey v. Grand Lodge, etc., 50 Mo. App. 472; Supreme Lodge, etc. v. Keener (Tex. Civ. App.), 25 S. W. R. 1084; Grand Lodge v. Jesse, 50 Ill. App. 101; Knights of Honor v. Oerters, 95 Va. 610; (2)    Lavin acquiesced in his suspension and abandoned the order.    Borgraefe v. Knights and Ladies of Honor, 26 Mo. App. 226; State ex rel. Stone v. Grand Lodge, 78 Mo. App. 546; Stewart v. Supreme Council, 36 Mo. App. 319; Glardon v. Knights of Pythias, 50 Mo. App. 45; Sovereign Camp, etc. v. Hicks, (Tex. Civ. App.) 84 S. W. R. 425; Supreme Lodge v. Wilson, 66 Fed. Rep. 785; Ryan v. Mutual Reserve Fund Life Ass'n, 96 Fed. Rep. 786; Mutual Life Ins. Co. v. Allen, 178 U. S. 351; Grand Lodge A. O. U. W. v. Scott (Neb.), 95 N. W. Rep. 191.

*James J. O'Donohoe* for respondent.

Lavin's suspension being void it was not incumbent on him to seek reinstatement, and the non-payment of assessments after the void suspension cannot be set up as a ground of forfeiture or abandonment. Melroy v. Knights of Honor, 28 Mo. App. 474; Glardon v. Knights of Pythias, 50 Mo. App. 45.

GOODE, J.—The plaintiff, Annie Lavin, is the widow of Patrick Lavin, deceased, who was a member of Standard Lodge No. 80 of the defendant Order. He held an insurance certificate in the Order dated January 23, 1899, of which certificate plaintiff was the beneficiary. It entitled her to receive $2000 at the death of her husband, provided he was then a member of the Order in good standing. This action is on that certificate for the amount of the insurance stipulated to be paid. The defense is two-fold: First, that Lavin failed to pay the monthly assessment of $2, 62 for the month of September, 1900, on or before the 28th day of that month as required by the laws of the Order and that by such failure he was suspended immediately from his membership in the Order and his certificate became null and void; second, that on November 1, 1900, Lavin abandoned his membership in the Order and severed his connection therewith, whereby his membership certificate became null and void.

This case was here on a former appeal, and the opinion given on that appeal will be found reported in the 104 Missouri Appeal Reports, page 1. The facts of the case are stated in detail in connection with that decision, in which we held that there could have been no forfeiture of the certificate of insurance for the non-payment of the assessment for September, 1900, provided it was tendered to the financier of the Order as required by the by-laws, prior to the 28th day of the month. The case was then reversed for certain errors and remanded to be re-

tried on the issue of whether a default occurred in the payment of said assessment and whether Lavin thereafter abandoned his connection with the Order. At the second trial there was conflicting evidence concerning the assessment for September, 1900. The testimony of Walsh, the financier of the defendant, and his daughter, was that Lavin's stepchildren tendered some money to pay his assessment, but an insufficient amount; and as the assessment for September remained delinquent until October 12th, when the financier made his report, Lavin was suspended from membership. There was a notation by the secretary of the Order in the minutes of the meeting held October 25th, that Lavin had been suspended. Walsh testified that he always notified a suspended member by letter of the suspension, and for that reason believed he notified Lavin, but had no distinct recollection of doing so. Lavin's stepdaughter, Annie Dooley, testified to tendering Walsh three dollars on September 3rd, to pay the assessment then due, which amounted to $2.62, and that Walsh refused to receive the amount, saying it was not enough. Her brother, John Dooley, testified that two days afterwards he took $5 to Walsh, which his father gave him for that purpose, and Walsh refused to accept the money, saying it was insufficient. Walsh contradicted the children, saying he was offered $2 in October and $3 a few days later, but those sums did not cover the assessments delinquent by the time the offers were made and he refused the money for that reason. The defendant put in evidence a letter bearing plaintiff's name at the end, which tended to prove Lavin had fallen behind in payment of his assessments on account of a labor strike and was not able to catch up. This letter was dated April 17, 1902, and is as follows:

"St. Louis, Mo. April 17, 1902.

"Dear Sir:—

"I am writing this letter to ask assistance for myself and five helpless children. My husband, Patrick

Lavin, died nine months ago. He was a member of your lodge. I was unable, utterly unable, to keep up payments of his lodge, so he fell back during the strike, was never able to catch up. He was in poor health, but always tried to keep on his feet, and to work, as he had no other support than his wages, which were $1.25 per day. Now since he is dead I am left to pay the rent, get food and clothing and support myself and five children. I have got heart trouble and of a very delicate constitution, and not really able to work to support such a heavy charge. I would be very greatful and appreciate any assistance given me from the brotherhood.

"Yours very respectfully,

"MRS. PAT. LAVIN."

Mrs. Lavin denied writing that letter. Other evidence was introduced tending to prove Lavin abandoned the Order. It was shown by a witness or two that he had expressed dissatisfaction with it and an intention to discontinue his membership. He paid no assessments or dues and made no tender thereof after September, 1900, although he lived until July 24, 1901.

Under the instructions of the court a verdict was returned for the plaintiff.

The contention of the defendant is that the court erred in refusing to direct a verdict for it, and this for two reasons. The first one is that the evidence conclusively proved Lavin neither paid nor tendered his September assessment prior to the 28th day of that month and, hence, he became suspended as a member. It should be stated that the by-laws provided for suspension *ipso facto* if a member failed to pay his assessments seasonably. No proceeding or hearing was necessary to work a suspension; and this sort of by-law is valid. We reject the argument that all the evidence went to show Lavin defaulted in September. The evidence is by no means conclusive that he did. There was testimony for the jury to weigh on the issue; for if the children told the truth, and they were not altogether uncorroborated, the Sep-

tember assessment was twice tendered and rejected. Much is said about the unreasonableness of the plaintiff's evidence on the point, and it does look improbable that such an incident occurred; but it was for the jury to take the improbability into consideration in weighing the evidence.

The other reason advanced in support of the proposition that the court shoud have directed a verdict for the defendant, is that Lavin neither paid nor tendered any assessment subsequent to September, 1900, though by the laws of the order, one fell due each month until he died. He neither paid further assessments nor took any steps to question his suspension or be reinstated, Therefore, it is argued, there can be no recovery on the certificate. According to the by-laws of the Order, Lavin could not be suspended from membership and his certificate forfeited for non-payment of *dues,* except by a certain procedure in the lodge, which was not taken. If the certificate became null and void for defaults after October, 1900, it was for failure to pay assessments. It is important here to ascertain the exact facts. The testimony for the defendant is that Lavin owed $2.62 in September, and the children testified to tendering respectively three and five dollars to pay his assessment. If they made those tenders, a sufficient amount was offered to the financier to discharge all that was owing and he was in duty bound to accept payment. We are stating the facts now according to the testimony for the plaintiff, as the jury believed the plaintiff's witnesses. It is certain that no payments were tendered for the subsequent months of Lavin's life, and that he made no effort to obtain reinstatement. The position taken by the defendant's counsel is that these undisputed facts show an acquiesecence in his suspension if he knew of it; or, if he did not, an abandonment of the Order—that if he expected to retain his insurance, he was bound to treat himself as a member and seek reinstatement, or, at least, offer to pay subsequent assessments, which the by-laws required

every member to pay each month. The circuit court took that view, as appears from the following instruction given to the jury:

"The court instructs the jury that, even if they find from the evidence that Patrick Lavin, or some one for him, tendered the financier of the Standard Lodge No. 80, in proper time, his assessment for September, 1900, and that the tender was refused, such refusal did not justify said Lavin in thereafter neglecting to pay or offer to pay subsequent assessments; and, if the jury find that between November, 1900, and July 24th, 1901, the date of his death, said Lavin did not pay or offer to pay further assessments, nor take any action toward disaffirming his suspension, if he knew of it, then said Lavin acquiesced in his suspension; and the jury must find for the defendant."

That instruction submitted the issue of whether Lavin defaulted in his assessments after September, and precluded recovery on the certificate of insurance if he did. This was trying the case according to the theory of the defendant's counsel, whose complaint is not of the instruction, but that the jury ignored it, as all the evidence went to show nothing was paid by Lavin after September. This was true; and if the instruction was sound, the court should have gone further and ordered the jury to return a verdict in favor of the defendant. The question for us to decide then is, does the fact that Lavin paid no assessments after September, bar recovery if, as the jury must have found, he had tendered the full amount due in September on two occasions and the financier of the Order had refused to accept the tenders? The position of plaintiff's counsel is that after Lavin had made two offers to pay his September assessment, it was incumbent thereafter on his lodge to notify him when it was ready to receive assessments from him, and until thus notified, he was under no obligation to make further tenders. There appears to be some discrepancy in the authorities bearing on the point in hand; though,

perhaps, the divergence of opinion is not considerable if the facts of the different cases are closely discriminated for the purpose of ascertaining whether the company which wrote the policy, took the position that the insured had lost all rights by his alleged default in payments. Nothing appears in the testimony to indicate that Walsh, the financier, was inspired by animosity against Lavin, or wished to deprive him of his membership and the benefit of his contract for insurance. If it is true the assessment for September was tendered to Walsh and refused, there is no reason to believe the refusal was arbitrary. It must have resulted from a mistake as to the amount due. Indeed the children testified that Walsh said the amounts they tendered were not enough. Lavin was reported delinquent and marked suspended, the by-laws working a suspension because of his delinquency. But the lodge was seeking no unjust advantage. Lavin was a party to the by-laws which annulled his membership in case of default, and was bound by them. Mistakes in regard to payments of dues are sure to arise in such societies, and, no doubt, a member will sometimes be suspended erroneously and without cause. If rightly suspended from the order an insured party is afforded ample relief against final forfeiture of his rights. During the first thirty days his membership may be renewed by paying all he owes in the way of dues and assessments; after thirty days he must procure a health certificate and be voted in by a majority of the lodge. He may be restored to his rights by following the rules at any time during six months. While the by-laws contain no provision for restoring a member who is suspended for a supposed default which never occurred, in view of the above privileges accorded in case of an actual default, it should be taken for granted that a member suspended by mistake, will be reinstated if he calls the attention of the proper officials to the error. It is to be presumed, unless the contrary is shown, that men will act according to reason and justice. Lavin

could easily have notified the officers of the lodge of.
Walsh's refusal of the September assessment and that
the suspension was wrong. If he had followed that'
course, likely the mistake would have been rectified; at:
any rate, he would have shown he did not acquiesce in
his suspension. He did nothing for ten months; that is,
during the remainder of his life. Now, if the contention
of plaintiff's counsel is correct, during all that time the'
insurance was in full force; though no dues or assess-
ments were paid; and it would have continued in force·
indefinitely from the bare circumstance that Walsh had.
refused payment of one month's assessment when he
ought to have accepted it. And this, too, when. there
was nothing to show injustice toward Lavin was intend-
ed. If the Order had taken the position that it would re-
ceive no more assessments or dues, and would not afford
Lavin redress, a forfeiture of his contract would not be
tolerated. As has been stated many times, the law does
not require the performance of useless acts; and if it
was apparant, at the time, that an offer by Lavin to pay
assessments would meet with rejection, he would lose no
right by not making the offer. This principle rests at
the root of a great many of the decisions in cases some-
what cognate to this one, as will appear from an analysis
of some of them. In Manhattan Life Ins. Co. v. Le Pert,
52 Texas 504, the policy was issued in 1852 and pre-
miums paid until 1862, when the Civil War interrupted
the payments until 1865. In the latter year the insured
tendered the accrued premiums to the man who had been
the company's agent at Galveston when the war broke
out, but said agent declined to receive them, as he had
not heard from his company for years and was uncertain
regarding his authority. No further tender of premiums
was made, nor any steps taken until 1871, when the in-
sured notified the company that he was too poor to pay
the premiums in arrears and desired the surrender value'
of the policy. The insured died in 1871, and in an action
on the policy by the beneficiary, it was decided that as.

the refusal of premiums in 1865 was put by the agent on the ground of unwillingness to act for the company until he heard from it, and not on the ground of forfeiture of the policy for non-payment of premiums during the war, the insured had no right to assume the company had treated the policy as at an end, or that it would be an idle formality to tender premiums thereafter; that having made no subsequent tender while he lived, a forfeiture occurred because of his default. In Meyer v. Ins. Co., 73 N. Y. 516, the policy had been declared forfeited by the company for non-payment of a premium, although the insured was put in default by the company's conduct. At various times thereafter, money to pay the accrued premiums was sent to the company and returned on the ground that the policy had been forfeited by the first default. In view of those facts it was held not to be necessary for the insured to continue indefinitely to tender premiums, when it was apparant the company had elected to treat the contract as cancelled and that it would accept no further payments. In Guetzkow v. Mich., etc., Ins. Co., 105 Wis. 448, the defendant's agent had refused to accept a premium due originally December 14, 1895, but tendered November 14, 1896, pursuant to an agreed extension, unless the insured would produce a health certificate, which the agent had no right to demand. Thereafter the agent rejected several other offers of payment. Later, another premium, due December 14, 1896, was not paid on account of the agent's persistent refusal to receive the first one. Still later, two tenders were made and rejected; but afterwards the first premium was demanded by the agent and paid, the agent declining to receive the one that accrued in December, 1896. In consequence, that premium remained in default when the insured died. The insured was ill when a health certificate was demanded and continued ill until his death. To procure the certificate was impossible, and it was not due to the company, because the insured had tendered payment of premiums promptly. The

court said regarding the contention that the policy laps-
ed for failure to pay the premium of December 14, 1896,
that the conduct of the company's agent justified the in-
sured in believing the premiums would not be accepted
without a health certificate, which was out of his power
to obtain, as he was ill. It will be perceived that, in that
case, the company demanded an act of the insured which
it had no right to demand and the insured could not per-
form. But the company treated him as having no rights
unless he did perform it. In Pulling v. Ins. Co., 55 Ill.
App. 452, 159 Ill. 603, the refusal to accept an annual
premium was accompanied with a declaration that no
further premiums would be accepted. It was held that
this conduct on the part of the insurance company kept
the insurance alive. In Greisemer v. Ins. Co., 10 Wash.
202, 38 Pac. Rep. 1031, the company had determined
that the rights of the claimant under the policy were ter-
minated by the non-payment of a premium. The court
found that enough appeared to show the company had
elected to stand on the forfeiture growing out of said
non-payment and would have refused a premium if it
had been tendered. The decision that no forfeiture was
worked by failure to offer future payments, was based on
the ground that the offers would have been fruitless. In
Sullivan v. Ben. Assn., 26 N. Y. Supp. 186, the associa-
tion denied having approved the application for insur-
ance or that a contract ever was made, and rejected the
first premium tendered. It was ruled that as the com-
pany disowned its obligation, it could not claim a forfei-
ture by reason of the non-payment of premiums. In Pil-
cher v. Ins. Co., 33 La. Ann. 222, a like ruling was put
on the ground that the company denied the existence of
the insurance contract. In Manhattan Ins. Co. v. Smith,
44 Ohio St. 156, it was said that if an insurance com-
pany repudiated its contract and adopted such a course
of conduct as clearly indicated that the tender of a pre-
mium would be rejected, failure to tender would not de-
feat an action on the policy. Other cases of the same pur-

port might be mentioned. It is obvious that such decisions have a very remote bearing on the question at issue in the present controversy. They were given in cases not against benevolent societies, but where a company organized for profit, was endeavoring to avail itself of a default which it had caused. The purpose of the present defendant is not profit, but to provide for the families of deceased members; and there is nothing even tending to prove it would have refused to reinstate Lavin, or correct the blunder made against him, if he had sought redress. No motive for such a refusal appears.

The proposition before us was presented to the Supreme Court of Nebraska in a case against this very defendant and decided both ways. The first decision was that the failure of the insured to tender assessments after his wrongful suspension, forfeited the insurance. Grand Lodge Ancient Order United Workmen v. Scott, 93 N. W. (Neb.), 90. On a rehearing that decision was overruled and it was held no forfeiture occurred, as the financier of the order alone was to blame, he having refused the assessment when tendered. That case is in point, but admits of one distinction from the case at bar. Scott had made a deposit with the financier of the local lodge sufficient to cover the assessments for several months; that is from September, 1893 to January 1, 1894; but the financier had refused to apply the deposit in payment of either of the assessments for the four months. This, of course, was equivalent to the rejection of four tenders. However, the reasoning of that case is favorable to the present plaintiff's cause. In Sovereign Camp Woodmen of the World v. Hicks, 84 S. W. 425, the Texas Court of Appeals held that an insured who had been unlawfully suspended for non-payment of assessments, which he had done all he could to pay, lost his insurance by failing to tender subsequent assessments during the several months he continued to live. The court said:

"Payment of the January assessment would not ex-

cuse non-payment of subsequent assessments, and it cannot be reasonably contended that a mere offer to pay the January assessment would absolve from failure to pay the February and March assessments. Deceased was charged with a knowledge of the constitution and laws of the order, and, if he failed to obey them, the beneficiary can reap none of the benefits of the certificate arising from his death."

In Karcher v. Sup. Lodge, 137 Mass. 368, it was ruled that though a member of the defendant order might have been wrongly suspended, as he failed to appeal from the suspension he lost his rights as a member. Karcher was suspended for the non-payment of an assessment which he was prevented from paying by illness. In Simmons v. Ben. Soc., 10 N. Y. Supp. 293, the decision was that it was no defense to an action on a benefit certificate that the insured was in arrears for dues, he having paid all dues until he was wrongfully expelled and tendered *those accruing afterwards and until his death*. The doctrine of the last two cases looks reasonable; because, as we have already said suspension due to mistakes are apt to happen in conducting these societies, and as the mistakes can be corrected, it is nothing but just to require the insured member to apply for redress if he wishes to retain his membership. The adoption of the converse ruling would be most unjust and lay societies liable on certificates of insurance held by persons who, through months or years, contributed nothing toward defraying the expenses of the order or discharging its insurance obligations. This court has had occasion to deal with the question, and we think the fair deduction from its decisions is that unless there is some better reason than existed in this case for a member's failure to remonstrate against his suspension, or tender assessments after one has been declined, he loses his rights as a member. The subject was first touched in Mulroy v. Knights of Honor, 28 Mo. App. 463. Mulroy had been unlawfully expelled by his lodge, and, so decid-

ing, the opinion remarked that as his expulsion was void, it was not incumbent on him to take steps to have it reversed in a higher tribunal of the society, but he was left clothed with the rights of membership despite the action of the society against him; that if he paid no assessments thereafter, he was not notified to pay any, and, consequently, non-payment worked no forfeiture of his insurance. That doctrine would support the plaintiff's case, if it had been adhered to; but it was renounced. In Hoeffner v. Grand Lodge, 41 Mo. App. 359, the insured had been unlawfully expelled, and it was held a recovery might be had on the certificate of insurance by the widow of the member, as the evidence showed "all dues to the society were tendered when payable, between the date of the alleged expulsion and the date of the member's death," and there was no evidence that other duties were required of members which the deceased failed to perform. Those remarks indicate that this court deemed it incumbent on a member of a benefit society, when unlawfully suspended or expelled, to act thereafter as a member, if he wished to enjoy the rights and privileges of one; that he might not behave as though the rules of the order were no longer binding on him, perform none of his duties, pay none of his dues and assessments, and still retain the same privileges and benefits he would enjoy if he was carrying his share of the society's burdens. A suspended member must either acquiesce in his suspension or protest against it—must keep his insurance *cum onere*. If he does not protest formally and by words, he must treat his membership as still subsisting, not alone for the purpose of giving rights, but for the purpose, as well, of imposing burdens. He cannot elect to regard it as at an end, so far as the obligation to pay dues and assessments and comply with the other rules of the order is concerned, but in existence as far as his certificate of insurance is concerned. He must treat himself as in the Order for all purposes or as out of it.

The opinion in Guetzkow v. Ins Co., 105 Wis. 448, announces this doctrine:

"The rule of law is maintained with great unanimity that one party cannot predicate a forfeiture upon an omission by the other which his own conduct has helped to bring about; that the declaration that a policy of insurance is already forfeited will constitute a sufficient justification for the omission to tender subsequently accruing premiums or instalments, upon the ground that the assured is justified in believing that no tender would be accepted, and the formality is therefore unnecessary; that the law will not require the doing of a vain thing. 2 Joyce, Insurance, section 1123; Shaw v. Republic L. Ins. Co., 69 N. Y. 286; Girard L. Ins. Co. v. Mut. L. Ins. Co., 86 Pa. St. 236; Nat. Mut. Ins. Co. v. Home Ben. Soc., 181 Pa. St. 448."

The rule thus declared is a sound one when the facts authorized its application, as they did in the Wisconsin case, and such other decisions as we have examined wherein it was followed. We are of the opinion, too, that it is a rule which might find fit application to the conduct of a fraternal insurance company in suspending a member and forfeiting his insurance in an oppressive and arbitrary manner. But it is obvious that to give effect to the rule, where such a society suspends a member by mistake, and its by-laws afford ample means for the reinstatement of members even rightly suspended, would work gross injustice. If we take into consideration the general spirit of the by-laws and rules of the defendant in providing for the reinstatement of members, it cannot be held logically that a breach of duty by the order estops it to claim a forfeiture of membership and authorizes an injured member to refrain, thereafter, from paying dues and assessments. The by-laws, far from contemplating his suspension as concluding a member's rights or giving the association the advantage of a forfeiture, look to his seeking relief. Every breach of a contract by one party does not release the other party

from his duty to perform or tender performance. It is true that when a party is prevented from performing by the wrongful act of the other party, the former loses no right under the contract because of non-performance. But the acts relied on to excuse must be of the kind deemed in law sufficient to excuse the obligor. Springfield Seed Co. v. Walt, 94 Mo. App. 76, 67 S. W. 938; Koerper v. Investment Co., 102 Mo. App. 543, 77 S. W. 307. It has been said there is no precise rule to settle whether a breach of contract constitutes an abandoment of it; but that if the act of one party is such as to prevent the other from performing the contract according to its terms, it may be rescinded by the latter. Lake Shore, etc., Ry. v. Richards, 30 L. R. A. 33 and note on page 49; Wright v. Haskell, 45 Maine, 489; Dubois v. Canal Co., 4 Wend. 285. It has been said also that "you must look to the actual circumstances of the case in order to see whether one party to the contract is relieved from future performance by the conduct of the other." Mersey Steel Co. v. Naylor, L. R. 9 App. Cases 434, L. R. (Q. B. Div.) 648. That was remarked in a case where the failure of one party to perform was held not to excuse performance by the other, because the failure was neither in respect to a condition precedent nor did it go to the entire consideration. In many instances of breach of contract the innocent party must go on with his duty and look to an action for reimbursement for loss sustained by the breach. Any other rule would work gross injustice and hardship; for trivial breaches resulting in inconsiderable loss or none at all, could be laid hold of as justifying the opposite party to default in his obligation and yet claim the benefits of the agreement. Breach v. Curle, 15 Mo. 105; Midland R. R. v. Rolling Mill, 10 Ont. App. 677; Sumner v. Parker, 36 N. H. 449; Way v. Johnson, 58 N. W. Rep. (Dak.) 552. To justify rescission by a non-defaulting party, the breach by the other must be of a fundamental and vital character. The defendant association merely made use

of the regular and agreed means to enforce payment of assessments. There is not a line of evidence to induce the belief that Lavin would have been denied redress if he had demanded an investigation, or, in any way, had brought to the attention of the Lodge the fact that he had offered to pay all he owed. The method of business followed by fraternal insurance associations, and by the defendant as one of them, must be taken into account in estimating the significance, purpose and effect of the suspension of Lavin. Instead of the facts indicating a final rescission of the insurance contract by the defendant, they show it would not have been rescinded without affording a chance for reinstatement, even if Lavin had been in default. Much less would he have been refused reinstatement if not in default. A benevolent association, like a regular insurance company, may assume such an attitude toward a member because of his supposed default, or any other breach of duty, that failure to pay assessments thereafter will work no forfeiture of the insurance contract. The order may so persistently reject tenders or refuse to correct mistakes and reinstate a member on proper application, as to relieve him of the obligation to do more. Each case must be examined on its merits and the question in this one comes down to this: whether, considering the conduct of the defendant toward Lavin, it is possible to hold he did what was incumbent on him to avoid a forfeiture of his rights. The defendant's only breach of duty, according to the version of the plaintiff's witnesses, was to refuse payment of one month's assessment when tendered. The ground of the refusal was stated at the time and was that the sum tendered was insufficient. No construction could be put on such an act except that a sufficient sum would be accepted, and if the sum tendered was, in fact enough, it was apparent that a mistake had occured. According to the plaintiff's testimony the tenders were made on the third and fifth of September, and from then until Lavin

died the latter part of the following July, the defendant's officers never heard from him. He neither protested against his suspension nor took a single step to have his rights restored and keep his contract alive, though he was familiar with the law of the order by which he was bound. He knew that if his assesments were not paid by the 28th of each month, he would be suspended; for it is shown that a paper containing advice of that kind was sent to him regularly. We have been allowing the plaintiff the benefit of her evidence in this discussion, because it found credence with the jury. To our own minds the evidence is well nigh irresistible that the full assessment for September was never tendered and that Lavin deliberately abandoned the order. Be that as it may, it is our duty to treat the case according to the testimony for the plaintiff. It was argued that the defendant should have notified Lavin when it was ready to accept further assessments from him; and this contention finds support in the Nebraska case, supra. We are unwilling to accede to it. By that doctrine an insured party who is wrongly suspended by a benevolent society, may continue silent the remainder of his life without forfeiting any right under his benefit certificate, although the order was willing to correct its wrong on being apprised of it. If Lavin's tender of the September assessment was refused by mistake, under a misapprehension of the amount due, the blunder might never have been detected by the defendant if the insured took no further action. He would, therefore, have stood suspended without the order being aware that it had wronged him or was under a duty to notify him future assessments would be received. We think something more than an offer to pay in the early part of September was incumbent on Lavin to preserve his contract in force during the rest of his life; and as he did nothing more, he ought to be held to have acquiesced in the suspension if he knew of it; or, in any event, to have abandoned his membership. Any other view would be extremely det-

rimental to the welfare of such societies and, as was pointed out in the case to be noticed, would put a wrongly suspended member in a better position than other members, by contiuing his insurance indefinitely without the payment of any premiums or assessments. In Glardon v. Supreme Lodge, 50 Mo. App. 45, this court, in dissatisfaction with what had been said in the Mulroy case, recurred to that opinion and modified it, approving incidentally the doctrine of the Hoeffner case stated above; which is, that in order for the beneficiary to recover on a certificate of insurance in a benevolent society after the wrongful expulsion of the insured member, it must apear "that the member himself treated the expulsion as void." That is the language used in the Glardon opinion in stating the rule announced in the Hoeffner case. The Glardon opinion pronounced that rule to be a necessary and salutary qualification of the doctrine of the Mulroy case, and stated reasons why the qualification was necessary. Among other things, the court said:

"The propriety of it will be manifest, when it is considered that a benevolent order of this kind may, and, as in the present case, often does, consist of many lodges and members scattered through all the States of the Union; that the class or rank of members who become contributors in the case of the death of one of them, may belong to many lodges; that the indemnity of the beneficiaries of these members rests largely upon the integrity and right action of particular lodges over whose action the members of the particular rank or class can exercise no control; from which it would seem to follow that, in the case of an expulsion, even though void, taking place by the act of a particular lodge or its officers, the expelled member is so far under a duty to his cocontributors of the class or rank to which he belongs as at least to make known his want of acquiescence in the sentence of expulsion. The rights of such a member, as has been often pointed out, rest merely in contract; and hence, his expulsion from the lodge and the order, and

his consequent deprivation of his membership and of his life insurance under his benefit certificate, is no more than the breach of a contract; and, although taking place by an act void for want of jurisdiction, it is no more than an act which is void in the sense of being voidable at the election of the member thus expelled. Clearly he may, at his election, affirm or disaffirm it. Where, as in the Mulroy case, he resists the expulsion, though without appeal, and fails for a year to pay subsequent dues, because such dues are not demanded of him, it may be regarded that he has sufficiently manifested his disaffirmance of the sentence of expulsion; and where, as in the Hoeffner case, he contiues to tender all dues when payable, this is clearly so."

Other pertinent remarks, which we do not care to recite, were made in support of the doctrine that if a member wrongly suspended or expelled, does nothing thereafter in the way of protest or to show that he regards himself as a member despite his suspension, he should be deemed to have acquiesced in the suspension. It is true that in the Glardon case the insured was in default when he died, not only for dues which had accrued after his expulsion, but for some which had accrued before. But we do not see that that fact detracts from the effect of the decision in establishing the doctrine that a member wrongly suspended or expelled, must do something to show he continues to insist on his rights as a member in order to avoid acquiescing in his suspension. The doctrine was again recognized in Purdy v. Life Assn., 101 Mo. App. 91, 107, 74 S. W. 486. Without deciding that a benevolent society may not so behave toward an insured member as to estop it to claim a forfeiture, even if the member paid no further dues or premiums, we do decide that to justify him in taking that course, the conduct of the society must be of a character to fairly imply that efforts to obtain recognition of his rights would prove fruitless. Nothing of the sort was proved against this defendant. In view of all the facts we

think no other conclusion can be reached under the evidence than that Lavin, after September, 1900, abandoned membership in the defendant Order. The jury disregarded a positive instruction of the court in giving a verdict for the plaintiff, and the judgment on the verdict, is, therefore, reversed and judgment entered here in favor of defendant. All concur.